PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBEKA RODRIGUEZ, individually and on behalf of all others similarly situated, | Case No. 3:25-cv-00225-AJB-KSC |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT** |
| v. | |
| CULLIGAN INTERNATIONAL COMPANY, a Delaware corporation, d/b/a WWW.CULLIGAN.COM, | |
| Defendant. | |

# INTRODUCTION

1.    Defendant owns and operates a website at https://www.culligan.com/ (the "Website").  When users visit the Website, Defendant causes tracking spyware to be installed on Website visitors' internet browsers.  Defendant then uses such spyware to collect Website visitors' IP addresses, which enables Defendant and third party spyware companies to learn the location, source, and identity of consumers who happen to land on the Website.  Because such spyware capture Website visitors' "routing, addressing, or signaling information," such spyware each constitute either a "pen register" or a "trap and trace device" under sections 638.50(b) and (c) of the California Penal Code.

2.    Plaintiff recently visited Defendant's Website.  By installing and using such spyware without Plaintiff's prior consent and without a court order, Defendant violated section 638.51(a) of the California Penal Code.  The harm caused by this intrusion is grave.  A recent online article describes how the CEO of the world largest data brokerage business "bragged about the degree to which his industry could collect and analyze data on the habits of billions of people."[1]  Referring to a hypothetical web user as "Lola," he boasted:

> "At a base level, we know who she is, what she watches, what she reads, and who she's living with.  Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that Lola has two children and that her kids drink a lot of premium juice.  We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf.  We can also see that Lola's income has not been keeping pace with inflation.  With CoreAI, we can predict that Lola has a high propensity to trade down to private label.  So rather than continuing with messaging for our client's premium brand to Lola, we immediately switch to promote the value brand in their portfolio.  Show now she sees refreshed content across all screens.  Thanks to CoreAI, we can do that with 91% of adults around the world."

---

[1]    https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last visited Apr. 4, 2025) (stating that one data brokerage firm, a French advertising conglomerate, Publicis Groupe, could deliver personalized advertising to approximately 91 percent of adult Internet users, *i.e.*, nearly four billion people).  The link to the YouTube video of Publicis Groupe's CEO, Arthur Sadoun, serving as the basis of the article is:  https://youtu.be/YCsE0VbH3vI (last visited Apr. 4, 2025).  The references to the hypothetical Lola consumer begins at the 5:32 mark through the 6:38 mark in such video.  The references to Publicis Groupe's ability to see and engage with 91 percent of all adults connected to the Internet begin at the 5:11 mark and is repeated at the 6:39 mark in such video.

**JURISDICTION AND VENUE**

3.      According to Defendant's Notice of Removal, this Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states.  (*See* Notice of Removal ¶ 7; Doc. 1; PageID.3.)

4.      Defendant is subject to jurisdiction under California's "long-arm" statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."  Defendant engaged in intentional acts by operating its Website and making it available to California residents, deceptively advertising its services and/or products via its Website to California residents including Plaintiff without clearly and conspicuously disclosing the capture of personal information of California residents without their prior consent, expressly aiming its conduct toward California residents by conducting substantial business with residents of the State of California via its Website, and causing harm to California residents that Defendant knew would be likely to be suffered in California.  Plaintiff is informed and believes and thereon alleges that Defendant generates a minimum of eight percent of its revenues from its Website based upon interactions with Californians, such that the Website "is the equivalent of a physical store in California."  *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal. App. 5th 1231, 1235 (2020), *review denied*, No. S264780 (Dec. 9, 2020).  Plaintiff is informed and believes and thereon alleges that Defendant sells services or products to California residents as part of its regular course of business.  Plaintiff is informed and believes and thereon alleges that Defendant sells thousands of services or products to California residents each year.  Plaintiff is informed and believes and thereon alleges that Defendant exercises at least some level of control over the ultimate distribution of its services or products sold via its Website to the end consumer including products shipped into California.

5.      Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

## PARTIES

6.      Plaintiff is a resident and citizen of California.  Plaintiff is both: (1) genuinely interested in the goods, products, and services of Defendant and information about them that is advertised on Defendant's Website; and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law.  As the Ninth Circuit made exceptionally clear, it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that courts must not make impermissible credibility inferences against them in evaluating their Article III standing to sue.  *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

7.      Defendant is incorporated in the state of Delaware.  According to Defendant's Notice of Removal, Defendant's principal place of business is located in Rosemont, Illinois.  Defendant sells bottled water, water filtration systems, and other water treatment solutions to customers throughout California.

## FACTUAL ALLEGATIONS

**A.    The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

8.      Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels.  *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

9.      More specifically, privacy protections against the disclosure of personal information are embedded in California statutes and at common law.  *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763

(1989) ("The Ninth Circuit has  repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients*"); In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites), *cert. denied*, 141 S. Ct. 1684 (2021); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

10.     In short, the privacy of personal information is—and has always been—a legally protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy inflicts an actionable "injury" upon an individual.

**B.     The California Invasion of Privacy Act and Pen Registers/Trap and Trace Devices**

11.     The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq.*, to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  (Cal. Penal Code § 630.)

12.     As relevant here, section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

13.     A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  (Cal. Penal Code § 638.50(b).)

14.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  (Cal. Penal Code § 638.50(c).)

15.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, whereas a "trap and trace device" is a "device or process" that records *incoming* information.  A "pen register" and "trap and trace device" are collectively referred to herein as "Pen-Traps" or "PR/TT".

16.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of those surveillance devices consistent with changes in both federal and state law.

17.    For example, with the passage of the 2001 USA PATRIOT Act, the Pen-Trap definition was expanded to include a device or process to keep up with the advancement and evolution of Internet technologies and communications. In 2015, the California Legislature overwhelmingly adopted this updated and expanded definition without a single vote in opposition.  *See* Stats. 2015, ch. 204, § 1 (A.B. 929) (eff. Jan. 1, 2016); *see also In re Order Authorizing Prospective & Continuous Release of Cell Site Location Recs.*, 31 F. Supp. 3d 889, 898 n.46 (S.D. Tex. 2014) (citing *Susan Freiwald, Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of PR/TT technology from mechanical device to computer system)).

18.    For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address that the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if the same user receives an email, a "trap and trace device" might record the email address it

was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

19.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies when such a reading would not conflict with the statutory scheme." *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

20.    Individuals may bring an action against the violator of any provision of CIPA—including section 638.51 of the Penal Code—for $5,000 per violation. (Cal. Penal Code § 637.2(a)(1).)

21.    CIPA provides for a private right of action and imposes civil liability and statutory penalties for the installation of pen register or trap and trace device without a court order. Cal. Penal Code § 637.2; *see also Greenley*, 684 F. Supp. 3d at 1050-51. In *Greenley*, the federal district court denied a motion to dismiss in a materially identical case, noting the "expansive language in the California Legislature's chosen decision," *id.* at 1050, which the court held was specific as to the type of data a pen register collects – DRAS – but "vague and inclusive as to the form of the collection tool – 'a device or process.'" *Id.* The *Greenley* court concluded that the language suggests that "courts should focus less on the form of the data collector and more on the result." *Id.* Having this legal framework in mind, the court applied the plain meaning to the word "process" and concluded that "software that identifies consumers, gathers data,

and correlates that data through unique 'fingerprinting'" is a process that falls within CIPA's "pen register" definition. *Id.*

**C. Website Operators Can Deploy Tracking Software to De-Anonymize Otherwise Anonymous Website Visitors and Track and Surveil Such Users.**

22.    Individuals who use devices to connect to an Internet website are typically anonymous and expect to remain anonymous.  Some rogue website operators, however, secretly attach a "tracking beacon" to visitor devices that are then used to track and surveil users.

23.    The tracking software will connect fragments of information – such as a unique IP address, user's operating system name, operating system version number, browser name, browser version number, browser language, screen resolution, geolocation data, email address, mobile ad IDs, embedded social media identities, customer and/or loyalty IDs, cookies and device signature – with connections between them. The tracking software also connects and correlates "undeclared identifiers", such as membership in an email or subscriber list, demographics, purchases/transactions, visits to online news sites, survey results, voter registration, and motor vehicle records.

24.    Using tracking software, a website owner can correlate a grouping of fragments and the connections between them to create a unique digital profile of each individual website visitor.  This process is known as "digital fingerprinting."

25.    If a website owner can link a unique digital profile created by digital fingerprinting to a particular individual, the website owner can assemble a detailed picture of a person's private life, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things.  *See* https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/ (last visited Apr. 18, 2024).

26.    Digital fingerprinting of a website's users allows the website owner or its agent to monitor user activity (such as page views, searches, or purchases), de-codes the device used by each website visitor, and enables a website to identify the location, race, age, preferences, internet browsing history, and ethnicity of each user.  This data is captured and processed for the purpose of identifying the source of electronic communications on the website for consumer identification purposes.

27.    The following graphic shows how a website deploying digital fingerprinting spyware has gathered and assimilated the digital fingerprints of a website visitor to create a unique digital identifier and link it to a previously anonymous individual named Mary Smith, thereby revealing a treasure trove of private information about Mary Smith's private life:





28.    In the above example, identity resolution has been achieved: using spyware materially identical to the technology used by the Defendant, the website owner has gathered and assimilated sufficient digital fingerprints of an anonymous visitor to identify that visitor as Mary Smith, and now knows the following information about her:

(a) Full name (*Mary Smith*)

(b) Date of birth *(May 1, 1979)*

(c) Gender *(female)*

(d) Home address *(2345 Avenue C, Papillion Nebraska)*

(e) Marital Status and Family *(Married with two children)*

(f) E-mail address (Mary.Smith@gmail.com)

(g) Personal Cell Phone: *(111) 123-4567*

(h) Voter Registration Status *(Registered)*

(i) Interests *(Shopping, Cooking, Traveling, Reading, Science)*

(j) Employer *(Karen's Fireside, Inc.)*

(k) Title *(Vice President)*

(l) Work Hours *(Daily 9-5)*

29.    For the preceding reasons, the ability to link a unique digital profile to a specific individual using digital fingerprinting is of great monetary value. Indeed, it has created an entire industry known as "identity resolution." Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints." *See* https://www.fullcontact.com/identity-resolution/ (last visited Apr. 18, 2024).

30.    One of the means by which a website owner can gather digital fingerprints as part of its identity resolution efforts is by deploying Pen-Traps spyware on its website.

31.    In lay terms, PR/TT spyware captures electronic impulses that identify the originating source of Internet communication by capturing routing, address, or signaling information. One means of doing so is to secretly deploy tracking spyware on a website.

32.    Indeed, PR/TT spyware has caught the attention of the United States Director of National Intelligence, who recently explained that "the advancement of digital technology, including location-tracking and other features of smartphones and

other electronic devices, and the advertising-based monetization models that underlie many commercial offerings available on the Internet" pose a threat to the individuals and "raises significant issues related to privacy and civil liberties."

**D.    The PR/TT Spyware Is Either a "Pen Register" or "Trap and Trace Device".**

33.    To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is depicted below in Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.  *See* Figure 1.

**Figure 1:**



34.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should display.

35.    In addition, the server's instruction cause at least one PR/TT beacon to be installed on a Website user's Internet browser.  The PR/TT beacon then causes the browser to send identifying information—including the user's IP address—to the PR/TT beacon's software provider.

36.    The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132).

37.    Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains the device's geographical location.

38.    Through an IP address, the device's state, city, and zip code can be determined.

39.    Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device.  Thus, knowing a user's IP address—and therefore a user's geographical location—"provide[s] a level of specificity previously unfound in marketing."[2]

40.    An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and …postal code"[3] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[4]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[5] precisely because "[c]ompanies can use an IP address … to personally identify individuals."[6]

41.    For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with a college-wide WiFi.[7]  For a job fair in a specific city,

---

[2] *IP Targeting:  Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/; *see* http://web.archive.org/web/20240329095134/www.accudata.com/blog/ip-targeting/ (last visited Oct. 31, 2024).
[3] *Location-based  Targeting  That  Puts  You  in  Control*, Choozle, https://choozle.com/geotargeting-strategies/
[4] Herbert Williams, The Benefits of IP Address Targeting for Local Businesses, LinkedIn (Nov.  29,  2023),  https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf (last visited Oct. 31, 2024).
[5] *IP Targeting:  Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/; *see* http://web.archive.org/web/20240329095134/www.accudata.com/blog/ip-targeting/ (last visited Oct. 31, 2024).
[6] Trey Titone, The future of IP address as an advertising identifier, Ad Tech Explained (May  16,  2022),  https://www.adtechexplained.com/p/the-future-of-ip-address-as-an-advertising-identifier/ (last visited Oct. 31, 2024).
[7] *IP Targeting:  Understanding This Essential Marketing Tool*, AccuData, https://www.accudata.com/blog/ip-targeting/;

Continued on the next page

FIRST AMENDED COMPLAINT
No. 3:25-cv-00225-AJB-KSC

1    companies can send advertisements to only those in the general location of an

2    upcoming event.[8]

3        42.    In addition to "reach[ing] their target audience with greater precision,"

4    businesses are incentivized to use a customer's IP address because it "can be more cost-

5    effective than other forms of advertising."[9]  "By targeting specific households or

6    businesses, businesses can avoid wasting money on ads that are unlikely to be seen by

7    their target audience."[10]

8        43.    In addition, "IP address targeting can help businesses to improve their

9    overall marketing strategy."[11]  "By analyzing data on which households or businesses

10   are responding to their ads, businesses can refine their targeting strategy and improve

11   their overall marketing efforts."[12]

12       44.    As alleged below, Defendant installs each of the PR/TT beacons on the

13   user's browser for marketing and analytics purposes, and the PR/TT beacons collect

14   information – users' IP addresses – that identifies the outgoing "routing, addressing, or

15   signaling information" of the user.  Accordingly, the PR/TT beacons are each "pen

16   registers."  Alternatively, the PR/TT beacons are each "trap and trace devices" because

17   they collect information – users' IP addresses – that identifies the incoming "routing,

18   addressing, or signaling information" of the user from the vantage point of the Website.

19       45.    The PR/TT beacon's software provider is a software-as-a-service company

20   that develops the PR/TT beacon provided to website owners like Defendant for a fee.

21   The PR/TT beacon's software provider uses such PR/TT beacon to receive, store, and

22   analyze data collected from website visitors, including visitors of Defendant's Website.

23

24   *see*  http://web.archive.org/web/20240329095134/www.accudata.com/blog/ip-targeting/ (last visited Oct. 31, 2024).

25   [8] *See, e.g.*, Personalize Your Website And Digital Marketing Using IP Address, Geofli, https://www.geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns (last visited Oct. 31, 2024).

26   [9] Herbert Williams, The Benefits of IP Address Targeting for Local Businesses, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf (last visited Oct. 31, 2024).

27   [10] *Id.*

28   [11] *Id.*
     [12] *Id.*

The PR/TT beacon's software provider provides analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the PR/TT beacon.

46.    The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the PR/TT beacon on the user's browser.  The PR/TT beacon, in turn, instructs the user's browser to send the user's IP address to the PR/TT beacon's developer.

47.    Moreover, the PR/TT beacon's developer stores a beacon or cookie in the user's browser cache.  When the user subsequently visits Defendant's Website, the PR/TT beacon locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the PR/TT beacon causes the browser to send the beacon or cookie along with the user's IP address to the PR/TT developer.

48.    If the user clears his or her cookies, then the user wipes out the PR/TT beacon from the user's browser cache.  Accordingly, the next time the user visits Defendant's Website, the process begins over again:  (i) Defendant's server installs the PR/TT beacon on the user's browser, (ii) the PR/TT beacon instructs the browser to send to the PR/TT developer the user's IP address, (iii) the PR/TT beacon stores a beacon or cookie in the browser cache, and (iv) the PR/TT beacon's developer will continue to receive the user's IP address on subsequent Website visits with the cookie or beacon transmission.

49.    The PR/TT beacon is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

50.    Further, the PR/TT beacon is a "device" because "in order for software to work, it must be run on some kind of computing device.  It is artificial to claim that software must be viewed in isolation from the computing device on which it runs and

1  with which it is inseparable in regard to the challenged conduct." *James v. Walt Disney*

2  *Co.*, 701 F. Supp. 3d 942, 958 (N.D. Cal. 2023).

3       51.    Because the PR/TT beacon captures the outgoing information—the IP

4  address—from visitors to websites, it is a "pen register" for the purposes of section

5  638.50(b) of the California Penal Code. Alternatively, because the PR/TT beacon

6  captures the incoming information—the IP address—from visitors to websites from the

7  perspective of the websites, it is a "trap and trace device" for the purposes of section

8  638.50(c) of the California Penal Code.

9  **E.    Defendant Secretly Installed Tracking Software on Plaintiff's and Other**

10      **Users' Browsers Without Prior Consent or a Court Order in Violation of**

11      **California Law.**

12       52.    Defendant owns and operates the Website.

13       53.    When companies build their websites, they install or integrate various

14  third-party scripts into the code of the website in order to collect data from users or

15  perform other functions.[13]

16       54.    Oftentimes, third-party scripts are installed on websites "for advertising

17  purposes." *Id.*

18       55.    Further, "[i]f the same third-party tracker is present on many sites, it can

19  build a more complete user profile over time." *Id.*

20       56.    Defendant has long incorporated the code of the PR/TT beacon into the

21  code of its Website, including when Plaintiff and other users visited the Website. Thus,

22  when Plaintiff and other users visited the Website, the Website caused the PR/TT

23  beacon to be installed on Plaintiff's and other users' browsers.

24

---

25  [13] "Third-party tracking refers to the practice in which a tracker on a website is set by a different website than the one the visitor is currently on. Third-party trackers are snippets

26  of code that are typically installed on multiple websites. They collect and send information about a user's browsing history to other companies, often for advertising

27  purposes. If the same third-party tracker is present on many sites, it can build a more complete user profile over time." https://piwik.pro/glossary/third-party-tracking/ (last

28  visited Apr. 18, 2024). "[C]ompanies may be in trouble using third-party cookies on their websites without complying with privacy laws in a specific jurisdiction…." *Id.*

57.     As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the PR/TT onto the user's browser.

58.     Upon installing the PR/TT on its Website, Defendant uses the PR/TT to collect the IP address of visitors to the Website, including the IP address of Plaintiff.

59.     The operators of the PR/TT beacons then use the IP address of Website visitors, including those of Plaintiff and other visitors, to serve targeted advertisements and/or conduct Website analytics.

60.     Defendant and its partners use the PR/TT beacon to "digitally fingerprint" each visitor.  While IP addresses alone do not provide exact personal information, they can reveal a user's approximate location, which can be used to infer details about the user's demographics, interests, or behaviors.  When combined together with third-party tracking cookies, which store information about the user's browsing habits and preferences, companies can create highly detailed user profiles.  This level of tracking, especially without clear user consent, can invade a user's privacy because the sharing or selling of the user data to multiple companies can result in unwanted targeted advertising, reduced anonymity, and potential exposure to data breaches.

61.     At no time prior to the installation and use of the PR/TT beacon on Plaintiff's and other users' browsers, or prior to the use of the PR/TT beacon, did Defendant procure Plaintiff's or other users' consent for such conduct.  The PR/TT beacon deploys prior to any efforts to notify visitors or obtain their consent to being tracked.

62.     Nor did Defendant obtain a court order to install or use the PR/TT beacon.

63.     The specific PR/TT spyware beacons detected on Defendant's Website are identified below, which explains the details of the beacons' deployment and the breadth of the beacons' operation.  Plaintiff's investigation of the Website has determined that at least 35 types of PR/TT spyware are deployed by the Website, *i.e.*, TikTok, Meta/Facebook, Neustar, Google Ads, Microsoft/Bing, LinkedIn, Nexxen, Criteo, Taboola, The Trade Desk, Adobe Audience Manager (demdex.net), Pubmatic, Nielson

Media – exelator.com and imrworldwide.com, SiteScout.com, MediaWallah, Index Exchange – casalemedia.com, Improve Digital – 360yield.com, Live Intent, Media.net, MediaVine.com, PostRelease.com, Outbrain, RevContent.com, Magnite / Rubicon Project, SmartAdServer.com, Teads.tv, Tremor Video, MNTN / Mountain, Throtle – thrtle.com, TPMN.io, TripleLift, Lotame – crwdcntrl.com, Yahoo, Lijit, and Media Math.

### 1.    Data Harvesting Without Consent

64.    When a user visits the Website, distinct third-party tracking services are detected. These entities, recognized as prominent digital trackers, employ sophisticated methodologies to profile users. These methodologies encompass the acquisition of device IP addresses, synchronizing external identifiers, utilizing TCP/IP header-derived IP addresses, and extracting user agent and device particulars. Additionally, they engage in cookie-sharing practices during request transmissions on the Website.

65.    Plaintiff's investigation of the Website via a computer expert has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's privacy policy.

66.    Defendant's Website lacks any cookie banner for a visitor to the Website to select any cookie-related preferences upon visiting the Website for the first time. Thus, the Website is designed so that a visitor can navigate through the various webpages of the Website without having to make any cookie-related preferences.  In other words, a visitor to the Website can read the content of various webpages without having to make any cookie-related preferences.  The following analysis of specific spyware detected on the Website reflects the analysis of such computer expert as an exemplar of what occurs during a typical user visit, and is not an attempt to allege that such expert was investigating the Website during Plaintiff's visit to the Website.

### 2.    TikTok

67.    The Website monitors visitor activity and sends requests to the TikTok platform, enabling TikTok to identify visitors and track behavior with hyper-granular details.  For example, the TikTok software gathers device and browser information, geographic information, referral tracking, and url tracking by running code or "scripts" on the Website to send user details to TikTok.[14]

68.    According to a leading marketing analytics firm, the TikTok Pixel works as follows:

> The TikTok Pixel is an HTML code snippet that tracks user actions, behavior, and conversions across your website. It's added to your site through your backend dashboard and uses data and cookies to track users and serve them relevant ads on TikTok based on how they interacted with your site.

> The TikTok tracking pixel provides a better understanding of who your customers are and how they navigate around your site. Plus, the data you get from TikTok conversion tracking will ensure you're serving highly-targeted ad campaigns to the right people.

> Using the TikTok Pixel can help you collect important information about the people who buy from you. Here are some of the biggest benefits:

> **Effectively track conversions:** Easily track sales from TikTok ads once the code is implemented on your site (you can choose which conversions and events you want to track, such as "add to cart", "newsletter signups", or "sales").

> **Optimize ad campaigns:** The TikTok tracking pixel makes it easy to optimize your campaigns by feeding the algorithm information about your customers and their on-site habits.

---

[14] *See* https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (describing TikTok pixel) (last accessed Jan. 2025).

**Target custom audiences:** Advertise to users who already know who you are with the custom audiences feature (you can create audiences based on visitors who took a specific action, bought a product, or simply visited your site).

**Easy to set up with ongoing rewards:** The TikTok pixel is relatively easy to set up and implement on your site. Once it's there, you have access to tons of data you can use to run successful ad campaigns.

*See* https://leadsbridge.com/blog/tiktok-pixel/ (last accessed Jan. 2025).

69.    According to a leading data security firm, the TikTok tracking pixel secretly installed on Defendant's website is particularly invasive.  The pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."  The pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe, including China and Russia", and does so "before users have a chance to accept cookies or otherwise grant consent."  *See Aaron Katersky*, **TikTok Has Your Data Even If You've Never Used The App: Report**, ABC News (last accessed December 2024), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249.

70.    Web beacons are sent to TikTok servers when visitors land on the Website and interact with the webpage.  Data tracked includes the page URL viewed, device type, device IP address, device user agent, event timestamp, page view unique ID, session unique ID, message event unique ID, and user tracking IDs as depicted in the screenshot image below.

FIRST AMENDED COMPLAINT
No. 3:25-cv-00225-AJB-KSC

71.     The third party _ttp tracking cookie is stored on the visitor's Internet browser, and sent with the request.  This cookie collects data that helps in tailoring the advertising experience, ensuring that users see advertisements that are more relevant to their interests.

| Request Cookies | ☐ show filtered out request cookies | | | |
|---|---|---|---|---|
| Name ▲ | Value | Domain | Path | Expires / Max-Age |
| _ttp | 2umJ0eOplxe3JQJFpQ7Cdo26u5Z | .tiktok.com | / | 2026-04-18T20:19:54.... |

72.     An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:



73.     The Website instantly sends communications to TikTok when a user views the page and track page interactions. In the example below, the right side of the image shows the various TikTok scripts being run by Defendant, and the electronic impulses being sent to TikTok to add to their collection of user behavior:



74.    The TikTok software is "reasonably likely" to identify the source of incoming electronic impulses.  In fact, it is designed solely to meet this objective.

75.    Plaintiff has a TikTok account.

**3.    Meta / Facebook**

76.    The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms as depicted in the screenshot image below:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



**4.    Neustar**

77.    Defendant has installed on its Website a spyware pixel of Neustar, Inc. ("Neustar") to identify Website visitors.

78.    Neustar's Customer Experience services connect data and media across channels (online, offline, television, etc.) to enable marketers to analyze visitor behavior to create segmented audiences for targeted marketing campaigns.

79.    Visitor devices are fingerprinted, and devices identified as being associated with users are tracked and unified into a single behavioral profile. Tracking is not limited to digital interaction; physical and offline activities are tracked and used to further build a predictive psychological profile for visitors.

80.    Neustar references its ability to engage in visitor identification via its Customer Experience services as follows:

/ / /

/ / /

/ / /



81.    Web beacons are sent to Neustar servers to track visitor activity and contain third-party tracking cookies stored on the visitor's Internet browser.

82.    Neustar's spyware uses algorithms to analyze internet and device data and predict whether two or more devices are owned by the same person. Participating websites and apps then cater their advertisements based on a collective knowledge of the user's actions across all of their devices. Neustar uses data such as cookie IDs, operating system IDs, IP addresses, online registrations, and data from partnering publishers to develop a probability that different devices are shared by the same person.

83.    Neustar is used for advertising to consumers across devices, where a user is shown an ad on their mobile or tablet device based on websites they visited on a desktop. For example, if an Android phone visits a website shortly after a desktop PC from the same home network, Neustar will assess that there is a high probability that the two devices are operated by the same person and will show them similar ads on both devices. Neustar also uses cross-device analytics for things like location, timing, user behavior, and audience analysis.

84.    The Neustar spyware activities described above are known as "fingerprinting." Simply put, the Neustar spyware collects as much data as it can about an otherwise anonymous visitor to the Website and matches it with existing data Neustar has acquired and accumulated about hundreds of millions of Americans.

Neustar is owned by Experian, and is a registered data broker in the State of California by its Department of Justice.   https://oag.ca.gov/data-broker/registration/562353 (last visited Apr. 4, 2025).

85.    Experian Information Solutions, Inc. itself is a data broker registered with the State of California's Department of Justice.  *See* https://oag.ca.gov/data-broker/registration/186691 (last visited Apr. 4, 2025). According to the esteemed Brennan Center for Justice, data brokers like Experian are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms…Advertising companies… predatory loan companies, stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."  *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last accessed Apr. 4, 2025).

**5.    Google Ads**

86.    Requests are sent to Google servers to visitor activity on the website and contains external tracking IDs to synchronize visitor data third-party data brokers.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /




### 6.   Microsoft / Bing

87.     A request is sent to the Microsoft service Bing.com to behaviorally track visitors, reporting content they have viewed across their session on the Website. After the request is processed by Bing, the server assigns visitors a machine unique identification value that allows for enhanced visitor identification and tracking across multiple website sessions.



88.    The MUID cookie is used for marketing and advertising and identifies unique web browsers to store and track visits across websites. The tracking cookie is stored on the visitor's browser for a year.



### 7.    LinkedIn

89.    The Website sends requests to the LinkedIn tracking pixel to sync visitor data with the audience data stored in the LinkedIn advertising account.



90.    LinkedIn tracking cookies are stored on the visitor's browser. Notable cookies include bcookie, li_sugr, and UserMatchHistory.



91.    The Bcookie cookie is used by the social networking service, LinkedIn, for tracking the use of embedded services. The Bcookie is a browser identifier cookie that is used to uniquely identify devices accessing LinkedIn.

92.    The Li_sugr cookie is a marketing cookie that is used to store and track a visitor's identity using probabilistic matching.

93.    The UserMatchHistory cookie is a marketing cookie to provide advertisement delivery or retargeting. This cookie contains a unique identifier used by LinkedIn to determine that two distinct hits belong to the same user across browsing sessions.

**8.    Nexxen**

94.    The Nexxen platform enables businesses to identify and segment visitors for marketing campaigns by collecting and analyzing audience data. This data can be bought or sold between companies, amplifying its reach and potential impact.

95.    When a visitor accesses a website using Nexxen, a request is sent to the Nexxen tracking URL (adnxs.com), which allows Nexxen to gather data about the user's device and location. The X-Proxy-Origin in the response header reveals the device's IP address, which identifies the geographic region from where the request originated.

96.    The Website sends requests to Nexxen to synchronize visitor cookie data with the third-party platforms Criteo and Media Wallah.





97.    The visitor's IP addresses are collected by the Nexxen servers.



98.     Tracking cookies stored on the browser and sent with the requests are depicted in the screenshot below:



**9.     Criteo**

99.     Criteo is a digital advertising platform that collects and aggregates user data so that advertisers can target users to deliver interest-based advertisements to their devices.  A screenshot from Criteo's privacy policy, which demonstrates what this looks like in practice, is depicted below:



100.   The Website sends requests to Criteo to record information about visitors, such as the unique URL viewed, device identifiers, and external tracking IDs, which are used for data synchronization with the Criteo platform.

101.   Third-party tracking cookies are stored on the user's Internet browser, allowing Criteo to record visitor browsing activity across multiple sites.

102.   The website creates an iframe connection to Criteo to synchronize data across third-party platforms. The screenshots below shows requests that are sent through the iframe.

103.   Services that are shown in the screenshots below include:

- Google Ads
- Nexxen
- Media Wallah
- Index Exchange
- Criteo
- Improve Digital
- LiveIntent
- Media.net
- LuckyOrange.com
- Mediavine.com
- Microsoft Ads
- PostRelease.com
- Outbrain
- Pubmatic
- Adobe Marketing
- Revcontent.com
- Magnite / Rubicon Project
- Smartadserver.com
- Taboola

- Teads.tv
- TremorHub.com
- MNTN
- Throtle
- TPMN.io
- TripleLift
- Lotame
- Neustar
- TheTradeDesk
- SiteScout
- Yahoo Ads
- Lijit
- Media Math
- Bidr.io

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**10.    Taboola**

104.    Taboola is an advertising company that collects and analyzes user data from websites enabling site owners/operators to monetize visitors by displaying targeted advertisements to them.  Artificial intelligence interprets the user's behavioral data to display targeted interest-based advertisements across the internet. The screenshot below is from the Taboola privacy policy, showing the type of data it collects to target users.



105.    A request is sent to Taboola servers to synchronize visitor data with the Criteo platform.



106.    Tracking cookies are stored on the browser.



**11.    The Trade Desk**

107.    The Trade Desk, Inc. is an American multinational technology company that specializes in real-time programmatic marketing automation technologies, products, and services, designed to personalize digital content delivery to users.

/ / /

/ / /



108.   The Website sends a request to The Trade Desk that identifies users and tracks their behavior across the website. This data is used to build audiences for target advertising and marketing campaigns.



**12.   Adobe Audience Manager (demdex.net)**

109.   The Audience Manager feature provided by Adobe collects user data from websites to build behavioral profiles and uses this data group them into audiences for various purposes.  These purposes include advertising and tailoring website content for the specific user.  Visitor IP addresses are collected for every new session on the website to determine the geolocation of the visitor which can be used to segment users for targeted advertising.

> Audience Manager helps you bring your audience data assets together, making it easy to collect commercially relevant information about site visitors, create marketable segments, and serve targeted advertising and content to the right audience. Furthermore, Audience Manager offers easy tag deployment and management with robust data collection, control, and protection.

110.   The Website uses third-party cookies for Demdex.net to assign tracking IDs to users and record their online activity via data sent in network requests.  These

are the tracking cookies stored on the browser for enhanced visitor identification and tracking with future requests.



111.   The "demdex" tracking cookie is used to identify a specific user to link their activities on this Website to a visitor profile already stored.

112.   The Data Provider Match, or "dpm" cookie, is used when a website is trying to identify visitors and add their activity to an existing matched user.

**13.   Pubmatic**

113.   Pubmatic is an advertising platform for the buying and selling of user data for interest based advertising campaigns.  Below is a screenshot from Pubmatic's privacy policy showing categories and usage of data collected from users.  This states that online identifiers, demographic information, browser and device information, behavioral information, and geolocation information, are collected to run targeted advertising.



114.   The Website sends requests to synchronize visitor data with third party platforms using external user IDs and piggyback cookies.





115.   Tracking cookies are stored on the browser and sent with the requests.



**14.     Nielson Media – exelator.com, imrworldwide.com**

116.   Nielsen's Identity Sync solution captures data to help marketers measure how their campaigns drive business outcomes, uses non-cookie person-based identifiers among various devices as part of its Nielsen ID System. Tracking visitor online activities are not limited to the individual website using their service, but across the entirety of the internet.

117.   The Website sends a request to Nielson servers to synchronize visitor data with external platforms.



**15.     SiteScout.com**

118.   SiteScout.com provides advertising services that utilize data collection, behavioral analysis, and user retargeting.  A request is sent to sitescout.com to synchronize visitor data with external platforms. Tracking cookies are stored on the browser and sent with the requests.

/ / /

/ / /



### 16.    MediaWallah

119.    MediaWallah is a company that focuses on data connectivity and identity resolution in the data ecosystem sector.



120.    The Website sends requests to MediaWallah to track visitor data and synchronizes this user data across multiple partner platforms.



121.    Partner platforms include Nexxen, Lotame, Nielsen, Lijit, Pubmatic, Media Math, and Bidr.io.

/ / /

/ / /



**17. Index Exchange – casalemedia.com**

122.    Index Exchange – casalemedia.com is an advertiser marketplace for buying and selling user data to build audiences for targeted advertising and marketing campaigns.

123.    A request sent to Index Exchange servers contains tracking cookies stored on the browser. The external user ID is contained in the data payload.

/ / /

/ / /

/ / /



### 18.    Improve Digital – 360yield.com

124.    Marketplace for buying and selling advertising data. Screenshot from their website:



125.    The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party advertisement platforms.  Tracking cookies are stored on the browser and sent with the request.

### 19.    Live Intent

126.    An email marketing automation tool that identifies website visitors and uses behavioral tracking to create marketing audiences for their customers' targeted email marketing campaigns.

127.    Live Intent engages in data harvesting, visitor identification, user tracking, and monetizing user data.

128.   The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.  Tracking cookies are stored on the browser and sent with the request.





## 20.   Media.net

129.   Media.net is a global advertisement network that connects advertisers with publishers to deliver relevant ads to website visitors.  It uses contextual targeting technology to match ads with content on a publisher's website.

130.   The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.  Tracking cookies are stored on the browser and sent with the request.





1

### 21.    MediaVine.com

2    131.    The Website monitors visitor activity and sends requests to the third-party

3    service to store the tracked data for commercial purposes. External user IDs are

4    contained in the data payload to synchronize visitor data across third-party ad

5    platforms.  Tracking cookies are stored on the browser and sent with the request.

6

7    

8

9

10    

11

12

### 22.    PostRelease.com

14    132.    The Website monitors visitor activity and sends requests to the third-party

15    service to store the tracked data for commercial purposes.  External user IDs are

16    contained in the data payload to synchronize visitor data across third-party ad

17    platforms.  Tracking cookies are stored on the browser and sent with the request.

18

19    

20

### 23.    Outbrain

22    133.    The Website monitors visitor activity and sends requests to the third-party

23    service to store the tracked data for commercial purposes.  External user IDs are

24    contained in the data payload to synchronize visitor data across third-party

25    advertisement platforms. Tracking cookies are stored on the browser and sent with the

26    request.

27    / / /

28    / / /



### 24.    RevContent.com

134.    The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes. External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms. Tracking cookies are stored on the browser and sent with the request.



### 25.    Magnite / Rubicon Project

135.    Rubicon Project is an advertising technology company that automates the buying and selling of digital advertising.

136.    The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes. External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms. Tracking cookies are stored on the browser and sent with the request.

1

### 26.    SmartAdServer.com

2    137.    The Website monitors visitor activity and sends requests to the third-party

3    service to store the tracked data for commercial purposes.  External user IDs are

4    contained in the data payload to synchronize visitor data across third-party

5    advertisement platforms.  Tracking cookies are stored on the browser and sent with the

6    request.

7

8

9

10

11

12

13

### 27.    Teads.tv

14    138.    The Website monitors visitor activity and sends requests to the third-party

15    service to store the tracked data for commercial purposes. External user IDs are

16    contained in the data payload to synchronize visitor data across third-party ad

17    platforms. Tracking cookies are stored on the browser and sent with the request.

18

19

20

21

22

23

### 28.    Tremor Video

24    139.    Tremor Video DSP, a Taptica Company, is an online video advertising

25    software company that allows businesses to monetize their website traffic by building

26    segmented audiences and displaying targeted advertisements.

27    / / /

28    / / /



### 29.    MNTN / Mountain

140.    MNTN / Mountain is an Advertisement-Technology company with a specialization for video and tv advertising.  The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.



### 30.    Throttle – thrtle.com

141.    Throtle is an identity resolution service focused on the healthcare industry.  The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.  Tracking cookies are stored on the browser and sent with the request.



/ / /

/ / /

/ / /



### 31.    TPMN.io

142.   The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party advertisement platforms.  Tracking cookies are stored on the browser and sent with the request.



### 32.    TripleLift

143.   TripleLift is a programmatic advertising platform that tracks users to run targeted ads and marketing campaigns.

144.   The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party advertisement platforms.  Tracking cookies are stored on the browser and sent with the request.

### 33.     Lotame – crwdcntrl.com

145.    Lotame – crwdcntrl.com is a data management platform that is software for collecting and managing data. It allows businesses to identify audience segments, which can be used to target specific users and contexts in online advertising campaigns.

146.    The request was sent with tracking cookies stored on the web browser.



### 34.     Yahoo

147.    The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.  Tracking cookies are stored on the browser and sent with the request.



### 35.     Lijit

148.    The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.  Tracking cookies are stored on the browser and sent with the request.

### 36.     Media Math

149.    The Website monitors visitor activity and sends requests to the third-party service to store the tracked data for commercial purposes.  External user IDs are contained in the data payload to synchronize visitor data across third-party ad platforms.  Tracking cookies are stored on the browser and sent with the request.

/ / /

**F.    Defendant's Conduct Constitutes an Invasion of Plaintiff's Privacy.**

150.    The collection of Plaintiff's personally identifying, non-anonymized information through Defendant's installation and use of the PR/TT beacon constitutes an invasion of privacy.

151.    As alleged herein, the PR/TT beacon is designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of user data including Plaintiff's data.

152.    Companies such as Defendant share their users' data with the PR/TT beacon's developer.  In order for such developer to perform data analysis on user data and to assist companies like Defendant to run targeted advertising campaigns, the PR/TT beacon's developer needs to collect data that identifies a particular user.  This is why the PR/TT beacon's developer collects IP addresses:  it allows the developer to segment users in order to run targeted campaigns and perform data analysis.

153.    In other words, companies like Defendant are collecting users' data and sending it to its PR/TT beacon's developer for a profit including by optimizing its marketing campaigns.

**G.    Plaintiff's PR/TT Experience**

154.    Plaintiff has visited the Website within the applicable statute of limitations period via an Internet-connected computer.  In particular, Plaintiff's visit occurred in August 2024.

155.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the PR/TT beacon to be installed on Plaintiff's browser. Defendant and the PR/TT beacon's developer then used the PR/TT beacon to collect Plaintiff's IP address.

156.    Defendant and the PR/TT beacon's developer did more than just collect Plaintiff's IP address.  Based on the existence of multiple PR/TT beacons and tracking cookies deployed on the Website, Plaintiff is informed and believes, and thereon alleges, that the PR/TT beacon will collect and track a unique IP address, the Website user's operating system name, operating system version number, browser name, browser version number, browser language, screen resolution, geolocation data, email address, mobile ad IDs, embedded social media identities, customer and/or loyalty IDs, cookies and device signature – as well as the connections between them.  Plaintiff is also informed and believes, and thereon alleges, that Defendant and the PR/TT beacon's developer engaged in the identity resolution tactics described above in order to digitally fingerprint Plaintiff and other users of the Website.

157.    Defendant and the PR/TT beacon's developer used the information collected by the PR/TT beacon to analyze Website data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's and/or advertisers' revenue.

158.    Plaintiff did not provide Plaintiff's prior consent to Defendant to install or use the PR/TT beacon on Plaintiff's browser.

159.    Defendant did not obtain a court order before installing or using the PR/TT beacon.

160.    Plaintiff has, therefore, had Plaintiff's privacy invaded by Defendant's violations of section 638.51(a) of the California Penal Code.

161.    As explained above, Defendant knowingly and intentionally deployed PR/TT spyware to (1) decode and record the routing, addressing, and signaling information transmitted by Plaintiff's electronic device communication; and (2) capture

the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication as part of its identity resolution efforts. This conduct constitutes illegal installation of PR/TT spyware in violation of California law.

162.   Defendant did not obtain Plaintiff's knowing and informed consent to the preceding acts, nor did Defendant obtain a court order authorizing it to do so.

163.   Although Plaintiff informed Defendant that its conduct violated CIPA via a pre-filing written letter dated September 23, 2024, Defendant failed to either delete or agree to delete Plaintiff's personal information from its records in response thereto including Plaintiff's IP address.

**H.     Intangible Injury to Plaintiff's Dignity**

164.   Plaintiff suffered an injury to her dignity caused by the invasion of her privacy attributable to Defendant's wrongdoing and the wrongdoing of the aforementioned third parties.  Plaintiff has an interest in maintaining control over Plaintiff's private and sensitive information, as well as an interest in preventing their misuse.  Plaintiff suffered the loss of her anonymity in visiting and using Defendant's Website and her right to control information concerning herself due to Defendant's and the actions of third parties who are partners of Defendant in the wrongdoing alleged herein.  As a result of their actions, Plaintiff and her device were digitally fingerprinted and had tracking cookies installed on her browser that tracked her behavior while visiting the Website such as pages viewed.  Such tracking cookies transmitted Plaintiff's ***web-browsing history*** and other usage data back to the entities that attached the cookies.  The "disclosure of private information" is an intangible harm that is "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC. v. Ramirez*, 594 U.S. 413, 425 (2021).  This is consistent with longstanding Ninth Circuit precedent recognizing that historical privacy rights " 'encompass[] the individual's control of information concerning his or her person' ...

the violation of which gives rise to a concrete injury sufficient to confer standing." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 598 (quoting *Eichenberger*, 876 F.3d at 983).

## I.    Defendant Is a Principal Under Section 31 of the Penal Code.

165.    Section 31 of the Penal Code provides in relevant part:  "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

166.    Under section 31 of the Penal Code, Defendant is a principal of the violation of section 638.51 of the Penal Code by directly committed the act constituting the offense, which is a violation of section 638.51 of the Penal Code.  Alternatively, Defendant is a principal of such offense because it "aid[ed] and "abet[ted] in its commission.  Defendant aided in its commission by agreeing to allow the PR/TT Spyware makers' software to operate on its Website and, in fact, allowing such third-party software to operate on such Website.  Such acts were essential to the commission of the violation of section 638.51.

167.    Defendant knew that the PR/TT Spyware makers would collect personal information when Defendant installed or allowed the installation of the relevant code on its Website.  Defendant also knew that it would receive discounted or higher-quality analytics and other services derived from the data about consumers' online activities, including the option to target advertisements to customers that had merely browsed the Website.

168.    The PR/TT Spyware makers' software in the Website is designed for the purpose of de-anonymizing and tracking visitors of the Website.  The software design is not a mistake.  *See Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *11 (W.D. Wash. July 2, 2024) ("The SAC alleges that Amazon Connect is designed for the purpose of recording and analyzing communications between its customers (like

Capital One) and consumers or other entities."). Defendant knew this before agreeing to install and allow such third party spyware software to exist and operate on its Website. "'[I]ntent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he [or she] knows are substantially certain to result from his [or her] conduct.'" *King v. U.S. Bank National Ass'n*, 53 Cal. App. 5th 675, 712 (2020), *rev. denied,* No. S264308 (Cal. Nov. 10, 2020) (quoting *Schroder v. Auto Driveway Co.*, 11 Cal. 3d 908, 922 (1974)).

169.   As mentioned above, although Plaintiff informed Defendant that its conduct violated CIPA via a pre-filing written letter dated September 23, 2024, Defendant failed to either delete or agree to delete Plaintiff's personal information from its records in response thereto including Plaintiff's IP address.

170.   At minimum, Defendant's conduct may be considered intentional because it has been made aware of its wrongdoing via the commencement of this action many months ago, but has taken no remedial action to eliminate the wrongdoing. *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (citing *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021) ("At the pleading stage, … interception may be considered intentional 'where a defendant is aware of the defect causing the interception but takes no remedial action.'") (quoting *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020))).

## **CLASS ALLEGATIONS**

171.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**All California residents who visited Defendant's website while physically in California and whose personal information was shared with TikTok or other third parties by Defendant without effective and informed prior consent.**

172.   <u>NUMEROSITY</u>: Plaintiff does not know the number of Class members but believes the number to be at least one hundred.  The exact identities of Class members may be ascertained by the records maintained by Defendant.

173.   <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a.      Whether Defendant shared Class members' personal information with TikTok or other third parties;

b.      Whether Defendant obtain effective and informed consent to do so;

c.      Whether Plaintiff and Class members are entitled to statutory penalties; and

d.      Whether Class Members are entitled to injunctive relief.

174.   <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

175.   <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

176.   <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## **CAUSE OF ACTION**
## **FIRST CAUSE OF ACTION**

## Violations of the California Trap and Trace Law

## CAL. PENAL CODE § 638.51

177.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

178.   Plaintiff brings this cause of action individually against Defendant.

179.   Section 638.51 of the Penal Code provides that it is illegal for any "person" to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53."  (Cal. Penal Code § 638.51(a).)

180.   A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  (Cal. Penal Code § 638.50(b).)

181.   The PR/TT beacon is a "pen register" because it is a "device or process" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's computer or smartphone. (Cal. Penal Code § 638.50(b).)

182.   Alternatively, the PR/TT beacon is a "trap and trace device" because it is "device or process" that "capture[d]" the "incoming electronic or other impulses that identify the originating number or other … routing, addressing, or signaling information"—the IP address—"reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  (Cal. Penal Code § 638.50(c).)

183.   At all relevant times, Defendant knowingly installed the PR/TT beacon— which is either a pen register or trap and trace device—on Plaintiff's browser, and used the PR/TT beacon to collect Plaintiff's IP address, and track Plaintiff.

184.   The PR/TT beacon does not collect the content of Plaintiff's electronic communications with the Website.  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses 'constitute addressing information and do not necessarily

reveal any more about the underlying contents of communication than do phone numbers.'") (quotation omitted).

185.    Plaintiff did not provide Plaintiff's prior consent to Defendant's installation or use of the PR/TT beacon.

186.    Defendant did not obtain a court order to install or use the PR/TT beacon.

187.    Pursuant to section 637.2 of the California Penal Code, Plaintiff has been injured by Defendant's violation of section 638.51(a) of the California Penal Code, and seeks statutory damages of $5,000 for Defendant's violation of section 638.51(a). *See* Penal Code § 637.2(a)(1).

188.    By knowingly violating a criminal statute and accessing Plaintiff's browser to install tracking software without Plaintiff's prior consent, Defendant acted with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

## **PRAYER**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.    For statutory damages, punitive damages, reasonable attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5, and costs of suit; and

b.    For any and all other relief at law that may be appropriate.

Dated:  April 4, 2025                PACIFIC TRIAL ATTORNEYS, APC


By: */s/ Scott J. Ferrell*
Scott. J. Ferrell
Attorneys for Plaintiff

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I electronically filed the foregoing **FIRST AMENDED COMPLAINT FOR VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record..

Dated:  April 4, 2025

*/s/ Scott J. Ferrell*
Scott J. Ferrell
